UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SANDRA DALE,                                    Case No. 1:22-cv-10815

       *Plaintiff,*                          Mark A. Goldsmith
                                                United States District Judge
*v.*

DENIS MCDONOUGH,                                Patricia T. Morris
                                                United States Magistrate Judge

       *Defendant.*

_____/

## REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 16)

### I.    RECOMMENDATION

For the following reasons, **I RECOMMEND** that the Court **GRANT** Defendant's motion for summary judgment (ECF No. 16).

### II.    REPORT

#### A.    Introduction

Sandra Dale is a records manager at a medical center operated by the United States Department of Veterans Affairs ("VA"). After working for the VA for twenty-six years without incident, Dale suffered an allergic reaction when a coworker brought in shellfish for lunch.

1

The VA responded to this incident by requiring Dale's immediate supervisor to post a sign warning Dale's coworkers of her allergies, by instructing Dale's department to only consume allergens in the office breakroom, and by supplying Dale with an air purifier. And on Dale's request, the VA also offered to accommodate her allergy by relocating her worksite to separate her from the coworkers who had exposed her to shellfish.

Dale refused the VA's proposed worksite, fearing that because her new cubicle would be located in a manufactured "trailer," she would be exposed to formaldehyde fumes. Yet even after the VA tested the area for formaldehyde and found negligible traces—far below acceptable concentrations—Dale still declined the VA's offer. After rejecting the VA's next proposed accommodation, allowing her to telework, Dale sued the VA for violations of the Americans with Disabilities Act and the Rehabilitation Act. The VA has now moved for summary judgment on all of Dale's claims.

### B.    Background

#### 1.    Medical Background and Work History

Dale has been diagnosed with allergies to shellfish and formaldehyde. (ECF No. 16-18, PageID.664–66). She first learned of her shellfish allergy years before joining the VA after going into anaphylactic shock while eating shellfish. (ECF No. 16-3, PageID.367–69; *see also* ECF No. 16-2, PageID.160).

2

Dales has also suspected that she is sensitive to formaldehyde for several decades. Dale first noticed what she believes to have been a formaldehyde exposure in 1989 while enlisted in the Army. (ECF No.16-3, PageID.472). She explains that shortly after moving her workstation to a "trailer," she fell sick with an elevated white blood cell count and pregnancy complications. (*Id.*) Sometime after this incident, but before Dale joined the VA, she and her husband toured a "manufactured" home they were interested in purchasing. (*Id.* at PageID.488–89). But "each time" Dale visited this home, she became "sick." (*Id.*) The "salesperson" for the home suspected that Dale was sensitive to "certain padding" in the home that contained "formaldehyde" and recommended that she not purchase the house. (*Id.* at 489). Dale has also grown sick after spending time in recreational vehicles. (*Id.*) At some point, Dale read a pamphlet circulated by FEMA which, like the manufactured house salesperson, claimed that trailers and other manufactured buildings can emit formaldehyde. (*Id.* at PageID.307, 488). Based on that pamphlet and the salesperson's statements, Dale concluded that her past illnesses stemmed from formaldehyde exposure. (*Id.* at PageID.488–89).

Dale joined the VA in 1992 and began working as a "records manager" in 2014 at the Aleda E. Lutz Medical Center in Saginaw, Michigan. (ECF No. 16-2, PageID.150, 154–55). At least since 2014, Dale has worked out of a cubicle in an open-concept workspace. (*Compare id.* at PageID.154–55, *with* ECF No. 16-3,

PageID.300).  For the first twenty-six years of her career at the VA, Dale "totally" avoided any exposure to shellfish by warning her colleagues of her allergy.  (*See* ECF No. 16-2, PageID.162–63; ECF No. 16-3, PageID.297, 300, 321–23, 360, 366, 368; ECF No. 16-4, PageID.496; ECF No. 20, PageID.696).  She does not claim to have been exposed to formaldehyde during this time.

### 2.      Dale's Allergic Reaction

When Dale joined Health Information Management Services as a records manager, her department worked out of the basement in the main building at the Lutz campus.  (ECF No. 16-2, PageID.150; ECF No. 16-3, PageID.296, 300).  But in 2017, the VA began construction in her department's usual workspace and moved Dale's department to a building a few miles off-campus.  (ECF No. 16-2, PageID.295, 297).

In January 2018, Dale's immediate supervisor, Clareeta White, and a few of Dale's other coworkers began to regularly eat shellfish in the office after starting a new diet.  (ECF No. 16-3, PageID.320; *see also* ECF No. 16-2, PageID.169).  Dale had warned White of her allergy in 2015, and she had since informed the rest of her coworkers of her shellfish allergy.  (ECF No. 16-2, PageID.162–63; ECF No. 16-3, PageID.321–23).  Still, between January and March, Dale's coworkers would bring shellfish into the office, and Dale would experience mild symptoms from airborne exposure.  (ECF No. 16-3, PageID.320; *see also* ECF No. 16-2, PageID.169).

Indeed, her eyes would become "puffy and red" whenever White or other employees ate shellfish in their shared workspace. (ECF No. 16-3, PageID.320–21). Although Dale would ask White not to bring in shellfish, White brushed off Dale's requests, insisting that she and others had "a right" to eat shellfish. (*Id.*) White would also mock Dale's swollen eyes, asking Dale who had "hit" her. (*Id.*) Until Dale's coworkers went off their diet sometime in March, Dale controlled her symptoms with medication. (*Id.*)

But on April 9, Dale experienced a severe allergic reaction after one of her coworkers ate shrimp fried rice in their shared workspace. While sitting alone at her desk, Dale's throat became itchy, her eye began to twitch, and she noticed "welts" on her arms. (ECF No. 16-4, PageID.496–97). She then packed her belongings and told White that she had to continue her workday from the main building because she was having an allergic reaction. (ECF No. 16-2, PageID.171–72; *see also* ECF No. 16-2, PageID.171; ECF No. 16-10). White instructed Dale to seek medical care from the employee health unit after obtaining an "employee health form" from her "second level supervisor," Tom Zwingman. (ECF No. 16-7, PageID.593; ECF No. 16-2, PageID.171, 231–32).

By the time Dale left the area, her "breathing was horrible" and she had to use her "inhaler." (ECF No. 16-3, PageID.497). Dale also began to vomit on her way to the main campus. (*Id.*) When she arrived, she forgot where the employee health

5

unit was located and proceeded to the urgent care clinic for directions to the employee health unit.  (ECF No. 16-10, PageID.608).  While urgent care staff attempted to locate the employee health unit, Dale "ran to the bathroom" and "started throwing up" again. (ECF No. 16-2, PageID.232).  Once the urgent care staff located the employee health unit, Dale proceeded there without first obtaining the form from Zwingman.  (*Id.* at PageID.172–73, 232).  At the employee health unit, a physician monitored Dale as she recovered and recommended that she request an accommodation for her shellfish allergy.  (*Id.* at PageID.173–74).  Dale responded that she did "not need" an "accommodation."  (*Id.*)

### 3.    The VA's Response to Dale's Allergic Reaction

Dale met with White the following morning.  (ECF Nos. 16-9, 16-10).  White accused Dale of being "confrontational" after her allergic reaction because she "told" White that she needed to leave the worksite rather than "ask" for permission. (ECF No. 16-10, PageID.608).  White also shared her frustration that Dale did not obtain an employee health form from Zwingman as directed, and she accused Dale of seeking care from the hospital's urgent care clinic rather than the employee health unit.  (ECF No. 16-9, PageID.607).

White then instructed Dale to take four hours of sick leave for ending her workday early.  (ECF No. 16-10, PageID.609).  Dale followed White's instruction, but after an internal investigation, the VA restored Dale's sick leave.  (ECF No. 16-

6

3, PageID.336; *see* ECF No. 16-12).  White also suggested that Dale submit a formal accommodation request, but Dale refused to do so because she felt she should not have to request an accommodation "for an incident caused by [her] environment." (ECF No. 16-10, PageID.608–09).

Following the April 9 incident, Dale had no allergic reactions while working at the off-site location.  At the direction of the facility's Equal Employment Opportunity ("EEO") manager, Cheryl Biggins, White displayed a poster instructing all employees to be mindful of Dale's shellfish allergies.  (*See* ECF No. 16-2, PageID.225; ECF No. 16-7, PageID.599–600; ECF No. 16-8).  And soon after, both Biggins and White emailed Dale's department, instructing staff to only consume shellfish in the breakroom, rather than at their desks where Dale could be exposed. (ECF No. 16-11, PageID.611; *see also* ECF No. 16-7, PageID.601).

In response to Dale's allergic reaction and these warnings from White and Biggins, Dale's coworkers generally became more cautious.  Indeed, Dale remembers only two incidents at the off-site location following the April 9 reaction where her coworkers consumed shellfish in the workspace.  First, Dale claims that in July 2018, several of her coworkers held a barbecue where they served shellfish. (ECF No. 16-3, PageID.343–45).  But Dale's unit was not invited to this event.  (ECF No. 16-5, PageID.564).  And more to the point, Dale admits that her coworkers did not bring any shellfish into the shared workspace.  (ECF No. 16-3, PageID.343–45).

7

Instead, they cooked the shellfish outdoors and consumed it in the breakroom, out of Dale's presence.  (*Id.*)

Second, Dale testified that one of her coworkers, Shawn Weaver, began to approach her for conversations immediately after consuming shellfish in the breakroom.  (ECF No. 16-3, PageID.458–59).  Because Shawn never approached her in this manner before her allergic reaction, Dale believes that Weaver intended to cause her to have an allergic reaction.  (*Id.*)[1]

### 4.    Transfer Request

When the VA relocated Dale's unit to the off-campus office in 2017, Dale requested to remain at the main campus so that she would not need to commute between the two facilities for certain tasks.  (ECF No. 16-3, PageID.295–99).  Although the VA denied Dale's request, Dale continued to work with Stacie Little, the "chief" of the facility's "business office," to find open space at the main campus.  (*See id.*; ECF No. 16-14, PageID.654–55; ECF No. 16-15).  At the time, Dale did not wish to relocate to the main campus to avoid shellfish exposure; rather, she sought relocation exclusively because she desired to cut back on time spent

---

[1] Dale also testified that between the April 9 incident and the day White displayed the poster, White and others continued to eat shellfish at work.  (ECF No. 16-2, PageID.223–25).  Dale does not clarify whether they state the shellfish in the breakroom or at their desks.  (*Id.*)

commuting between the two facilities. (ECF No. 16-14, PagID.655; *see* ECF No. 16-3, PageID.298–99).

In September 2018, Little offered Dale a cubicle located in "Building [Thirty-Eight]" on the main campus. (ECF No. 16-15, PageID.658). But Dale declined her offer, both because the workspace in Building Thirty-Eight was too "small" and because Building Thirty-Eight was a "manufactured" facility that she believed emitted "formaldehyde." (*Id.* at PageID.657).

### 5.   Reasonable Accommodation Request

Over five months after her allergic reaction, Dale contacted Biggins and the Lutz Medical Center's reasonable accommodation coordinator, Minnie Beulah, for help requesting an accommodation for her allergy. (*See* ECF No. 16-16). In late October, Beulah emailed Dale a document titled "Request for Accommodation." (*Id.* at PageID.660–61). Although Beulah had answered several fields on Dale's behalf, she encouraged Dale to review the document and make any necessary changes. (*Id.* at PageID.659–60). Beulah also advised Dale to "say what" she was "requesting." (*Id.*) So too, the form itself instructed Dale to "[b]e as specific as possible." (ECF No. 16-17, PageID.662). Yet in the field titled "accommodation requested," Dale only wrote "relocation office/workstation (not telework)." (*Id.*) And under the "reason for request" prompt, Dale only stated "allergic reactions and harassment." (*Id.*)

After Dale submitted her reasonable accommodation request form and a document from her physician confirming her shellfish allergy, she implies that the VA offered her a cubicle in Building Thirty-Eight for a second time. (*Compare* ECF No. 16-15, PageID.658, *with* ECF No. 16-3, PageID.350; *see* ECF No. 13-3, PageID.3650).

Dale rejected this offer. (ECF No. 16-3, PageID.395). Again, she reiterated her belief that Buildings Thirty-Eight emitted furaldehyde fumes. (*Id.*) At the VA's request, Dale later submitted a second document from her physician confirming that she was allergic to formaldehyde. (ECF No. 16-3, PageID.350; *see also* ECF No. 16-18). Although short on detail, the form indicated that exposure to formaldehyde—at unspecified concentrations—caused Dale to experience shortness of breath. (ECF No. 16-18, PageID.665–66).

After receiving this form, Beulah requested that a formaldehyde test be conducted as soon as possible in Building Thirty-Eight. (ECF No. 16-11, PageID.672). The test results showed negligible concentrations of formaldehyde, far below acceptable standards. (ECF No. 16-23; *see also* ECF No. 16-24, PageID.675). Yet Dale still refused to relocate to Building Thirty-Eight because the VA tested for formaldehyde in the winter and she believed that formaldehyde levels could fluctuate based on temperature. (ECF No. 16-24, PageID.674; *see* ECF No. 16-3, PageID.488–89). Although Dale refused to relocate to Building Thirty-Eight,

10

she requested an "air purifier for [her] present location." (ECF No. 16-24, PageID.674). Beulah then closed Dale's accommodation request. (ECF Nos. 16-25, 16-26). She did, however, provide Dale with an air purifier. (ECF No. 16-3, PageID.310, 312; ECF No. 16-25, PageID.677). Dale later stopped using the purifier because she thought it was "too loud." (ECF No. 16-3, PageID.310, 312; ECF No. 16-25, PageID.677).

### 6.    Current Working Conditions

Dale remained at the off-campus location without incident for most of 2019. In fall 2019, her department moved back to the main campus where they worked out of a manufactured trailer, yet Dale stayed behind at the off-campus office for about one month after her department moved. (ECF No. 16-3, PageID.306–09; *see also* ECF No. 20-10).

During this time, Dale met with White and a group of other VA officials. At the meeting, White encouraged Dale to reopen her accommodation request and offered to allow Dale to telework. (ECF No. 20-6, PageID.767). Yet Dale refused to telework, and she declined to reopen her accommodation request because she felt that she should not have to "start a totally new process." (*Id.* at PageID.765–66; *see also* ECF No. 16-3, PageID.316, 405).

Dale did not join her department and ultimately moved to the basement of the main facility before the end of 2019. (ECF No. 16-3, PageID.309). Dale has had

one allergic reaction since relocating to the main campus after an employee who was unfamiliar with Dale's allergies microwaved lobster near her. (*Id.* at PageID.359– 64). Apart from this incident, Dale recalls no other allergic reactions, but she complains that because the cafeteria at her new facility serves shrimp during Lent, she can sometimes "smell[]" shellfish around this time of the year. (*Id.* at PageID.314–15, 363, 378). She also complains that her new desk sits under a vent which she believes carries second-hand cigarette smoke, containing formaldehyde. (*Id.* at PageID.314, 376–77, 417). Dale can usually "get up" and "leave" whenever she fears exposure to a suspected allergen. (*Id.* at PageID.360).

### 7.    Procedural History

After exhausting her Equal Employment Opportunity claims, Dale sued Denis McDonough, the Secretary of the VA, in his official capacity for violations of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act. (ECF No. 1; ECF No. 1-2; *see* ECF No. 16, PageID.129 (conceding that Dale exhausted her administrative remedies). Her complaint alleges that the VA violated both Acts by: (1) failing to offer reasonable accommodations for her allergies, (2) permitting a hostile work environment, and (3) retaliating against her for enforcing her rights under the Acts. (ECF No. 1, PageID.12–20). The VA has now moved for summary judgment on each of Dale's claims. (ECF No. 16).

## C.    Standard of Review

Summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A material fact is one that would affect "the outcome of the suit under the governing law. . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there . . . are any genuine factual issues that properly can be resolved only by a finder of fact . . . ." *Id.* at 249–50, 255.  Accordingly, "the evidence, all facts, and any inferences that may be drawn from the facts" must be viewed "in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004).  The nonmoving party cannot rebut a Rule 56 motion by merely alleging that a genuine factual dispute exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 n.3 (1986) (quoting Fed. R. Civ. P. 56(e)).  Instead, the nonmoving party must show that there is sufficient evidence in the record for "a reasonable finder of fact [to] find in its favor." *Anderson*, 477 U.S. at 248.

## D.    Analysis

### 1.    Reasonable Accommodation

Section 504 of the Rehabilitation Act prohibits discrimination against any "otherwise qualified individual with a disability . . . solely by reason of her or his

disability . . . ." 29 U.S.C. § 794(a) (2018).  Likewise, Title I of the ADA prohibits employers from discriminating against "qualified individual[s] on the basis of disability in regard to" any "terms, conditions, [or] privileges of employment."  42 U.S.C. § 12112(a) (2018).

Dale claims that by failing to accommodate her shellfish allergy, the VA discriminated against her in violation of both statutes.  But the ADA does not apply to federal employees like Dale.  42 U.S.C. § 12111(5)(B)(i); *see also Steinberg v. Vidal*, No. 22-CV-04971, 2022 WL 16744932, at *1 (E.D.N.Y. Nov. 7, 2022).  Her protections against disability discrimination lie exclusively in the Rehabilitation Act. *Stenberg*, 2022 WL 16744932, at *1 (quoting *Rivera v. Heyman*, 157 F.3d 101, 103 (2d Cir. 1998)); *see Bledsoe v. TVA Bd. of Dirs.*, 42 F.4th 568, 578–80 (6th Cir. 2022); *see Curry v. Wilkie*, No. 2:12-CV-0608, 2019 WL 1226112, at *9 (N.D. Ala. Mar. 15, 2019).

Although the Rehabilitation Act applies to different entities and imposes a more demanding causation requirement in cases concerning discriminatory adverse employment actions, its protections are otherwise coextensive with those of the ADA.  *S.S. v. Eastern Ky. Univ.*, 532 F.3d 445, 452–53 (6th Cir. 2008).  Indeed, § 504 of the Rehabilitation Act explicitly borrows the "standards applied under title I of the [ADA]" for cases regarding "employment discrimination."  29 U.S.C. § 794(d); *see also Jones v. Potter*, 488 F.3d 397, 403 (6th Cir. 2007).

Title I, in turn, defines discrimination to include the failure to make reasonable accommodations for disabled employees "unless" the employer "can demonstrate that the accommodation would impose undue hardship" on its operations. 42 U.S.C. § 12112(a), (b)(5)(A). Reasonable accommodations may include "adjustments"— either to the employee's "work environment" or to the "circumstances under which the position" is "customarily performed"—that allow a qualified, disabled employee to "perform the essential functions of" his or her position. 29 C.F.R. § 1630.2(0)(1)(ii). They also include "adjustments that enable" a disabled employee "to enjoy equal benefits and privileges of employment" apart from his or her "essential" responsibilities. *Id.* § 1630.2(0)(1)(iii). Common examples of accommodations include: the "acquisition or modification of equipment," physical changes to "existing facilities," adjustments to "work schedules, and the "provision of qualified readers or interpreters." 42 U.S.C. § 12111(9) (2018).

For a disabled employee to prevail on a failure-to-accommodate claim, the employee must first establish a prima facie case that he or she was qualified for, yet denied, a reasonable accommodation. *Brumley v. United Parcel Serv., Inc.*, 909 F.3d 834, 839 (6th Cir. 2018) (citing *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868–69 (6th Cir. 2007)); *see* 42 U.S.C. § 12112(a). To do so, Dale bears the initial burden of showing that: (1) she is disabled; (2) she is "otherwise qualified for her position, with or without reasonable accommodation"; (3) the VA "knew or had

15

reason to know about her disability"; (4) she requested an accommodation; and (5) the VA "failed to provide the necessary accommodation." *Kirilenko-Ison v. Bd. of Ed. of Danville Ind. Sch.*, 974 F.3d 652, 669 (6th Cir. 2020). Dale also bears the initial burden of proving that the requested accommodation was "'reasonable on its face . . . .'" *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 419 (quoting *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002)); *see also Gleed v. AT&T Mobility Servs., LLC*, 613 F. App'x 535, 538 (6th Cir. 2015).

If the employee establishes these elements, the burden then shifts to the employer to prove that the requested accommodation, though reasonable at face-value, would either impose an undue hardship on the organization or "eliminate[] an essential job requirement." *Fisher*, 951 F.3d at 419; *see* 42 U.S.C. § 12112(b)(5)(A) (requiring the "covered entity," rather than the employee, to "demonstrate" an undue burden).

The VA argues that Dale cannot establish her prima facie case for three reasons. First, Dale is not "disabled" as that term is used in the Rehabilitation Act. Second, even if Dale were disabled, she did not request a "reasonable accommodation" because no changes to her work environment were necessary to control her allergies. And third, although Dale did not request a reasonable accommodation, the VA still provided reasonable offers to modify Dale's work

environment. Because Dale cannot genuinely dispute these elements of her prima facie case, the VA asks the Court to enter summary judgment in its favor.

Although I disagree that Dale is not disabled under the Rehabilitation Act, I suggest that Dale still cannot establish a prima facie case because she declined reasonable accommodations for her allergies.

### a. Dale is Disabled by Her Shellfish Allergy, But Not by Her Formaldehyde Allergy.

Dale alleges that she is disabled by her allergies to shellfish and formaldehyde, and the VA asks the Court to grant summary judgment in its favor on the grounds that neither condition constitutes a disability under the Rehabilitation Act. Under both the Rehabilitation Act and the ADA, an individual is disabled if (1) he or she has "a physical or mental impairment that substantially limits one or more major life activities," (2) there exists "a record of such an impairment," or (3) he or she has been "regarded as having such an impairment." 42 U.S.C. § 12102(1) (2018); *see* 29 U.S.C. § 705(20)(B) (2018) (incorporating the ADA's definition of "disability" into the Rehabilitation Act). The impairment need not impact the employee's ability to work. *See Bryson v. Regis Corp.*, 498 F.3d 561, 576 (6th Cir. 2007) (analyzing an employee's ability to "work" as a distinct life activity from the employee's ability to "walk"). Indeed, "major life activities" include several basic functions such as

"seeing, hearing, eating . . ., [and] breathing."   42 U.S.C. § 12102(2)(A).   An employee's ability to "work[]" is just one of these activities.   *Id.*

Around the turn of the millennium, the Supreme Court issued a pair of opinions interpreting the ADA to impose a "demanding standard for qualifying as disabled . . . ."   *Toyota Motor Mfg., Ky., Inc., v. Williams*, 534 U.S. 184, 196–97 (2002).   In the first case, *Sutton v. United Air Lines, Inc.*, the Court held that ameliorative measures—say, the use of hearing aids, glasses, or prosthetics—must be considered when determining whether an impairment substantially limits a major life activity.   527 U.S. 471, 782 (1999).   And three years later, the Court addressed what it means for an impairment to have "substantial" limitation on a major life activity.   *Toyota Motor*, 534 U.S. at 196–98.   The Court explained that "to be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives."   *Id.* at 198.

But in response to *Sutton* and *Toyota*, Congress passed the ADA Amendments Act ("ADAAA") to correct the Court's "narrow" interpretation of the ADA and the Rehabilitation Act.   *Rotkowsi v. Ark. Rehab. Servs.*, 180 F. Supp. 3d 618, 623 (W.D. Ark. 2016).   The amendments and their corresponding regulations clarified that the requirement to demonstrate a "substantial" impact on a life activity was "not meant to be a demanding standard" and instructed Courts to construe the definition of a

"disability . . . in favor of broad coverage" and "to the maximum extent permitted . . . ." 42 U.S.C. § 12102(4)(A); 29 C.F.R. § 1630.2(j)(1)(i).  "An impairment need not prevent, or significantly or severely restrict ... a major life activity" to be substantially limiting.  29 C.F.R. § 1630.2(j)(1)(i)(ii).

Instead, "whether a disability substantially limits major life activities" is answered by comparing "the person claiming a disability to 'most people in the general population.'"  *Hostlettler v. Coll. of Wooster*, 895 F.3d 844, 853 (6th Cir. 2018) (quoting 29 C.F.R. § 1630.2(j)(1)(ii)).  That comparison must ignore the "ameliorative effects of" any "mitigating measures." 42 U.S.C. § 12102(4)(E).  The comparison should also focus on the impairment when it is "active."  *Hostlettler*, 895 F.3d at 854 (internal quotation marks omitted) (quoting 42 U.S.C. § 12102(4)(D)).  It matters not whether an impairment is "episodic or in remission." 42 U.S.C. § 12102(4)(D).

Before Congress passed the ADAAA, lower courts typically held that allergies and sensitivities to airborne irritants were not disabilities, relying on the Supreme Court's reasoning in *Toyota* and *Sutton*.  *E.g.*, *Robinson v. Morgan Stanley Dean Witter*, No. 05 C 04258, 2007 WL 2566294 (N.D. Ill. Aug. 31, 2007); *Walker v. Town of Greenville*, 347 F. Supp. 2d 566, 571–72 (E.D. Tenn. 2004); *see, e.g.*, *Land v. Baptist Med. Ctr.*, 164 F.3d 423, 425 (8th Cir. 1999).  For most people, allergies and similar sensitivities were simply too sporadic to have a "severe" impact

on their life activities.  *Milton v. Texas Dept. of Crim. Justice*, 707 F.3d 570, 574

(5th Cir. 2013) (applying pre-ADAAA standards).  Even if their allergies caused

harmful symptoms when active, most individuals could avoid exposure to allergens

or irritants.  *See id.*

Despite Congress's efforts to broaden the scope of the ADA and the

Rehabilitation Act, several courts have clung to this rationale, continuing to hold

that even severe allergies are not disabilities if symptoms only occur "sporadically."

*Whitesell v. FMS Fin. Mgmt. Servs.*, LLC, No. 3:15-cv-00496, 2020 WL 2770017,

at *7–9 (M.D. Tenn. May 28, 2020) (collecting cases).  Yet other courts have

correctly recognized that under the ADAAA, even sporadic, avoidable, or otherwise

manageable allergies may be disabilities if they impact an employee's major life

activities when active.[2]

Thus, it matters not that Dale has had only "two allergic reactions in more

than three decades."  (ECF No. 16, PageID.133).  Courts must evaluate the severity

of an impairment when it is "active," without regard to how "episodic" the condition

may be.  *Hostlettler*, 895 F.3d at 854; 42 U.S.C. § 12102(4)(D).  Nor does it matter

that Dale "takes allergy medicine daily" and may be able to avoid exposure by

---

[2] *E.g.*, *Mills v. St. Louis Cty. Gov't*, No. 4:17cv0257, 2017 WL 3128916, at *5–6 (E.D. Mo. July 24, 2017); *Hawkins v. Ark. Dept. of Hum. Servs.*, No. 4:15CV00546-JLH, 2017 WL 10621235, at *6 (E.D. Ark. Apr. 3, 2017); *Hebert v. CCE Entm't, Inc.*, No. 6:16-cv-00385, 2016 WL 5003952, at *3 (W.D. La. July 6, 2016); *Rotkowski*, 180 F. Supp. 3d at 622–24.

"relocating" herself as necessary.  (ECF No. 16, PageID.132, 134 (internal quotation marks omitted)).   Again, Congress passed the ADAAA in part to reject *Sutton*'s holding that courts must account for any mitigating measures when assessing an impairment's impact on life activities.  *Rohr v. Salt River Project Agric. Imp. & Power Dist.*, 555 F.3d 850, 861 (9th Cir. 2009); *see* 42 U.S.C. § 12102(4)(E) (listing "behavioral . . . modifications" as an example of a "mitigating measure").  Although these ameliorative measures may be relevant in assessing what accommodations, if any, an employee requires, they are not relevant when determining whether the employee is disabled.

Setting aside any ameliorative measures and assessing her allergy when it is active, Dale's shellfish allergy substantially limits several of her major life activities.  Taking the facts in the light most favorable to Dale, her allergy can cause anaphylaxis if she is exposed to shellfish in sufficient doses.  Indeed, she discovered her allergy after going into anaphylactic shock while eating shellfish at a restaurant.  (ECF No. 16-3, PageID.367-69).  And even airborne exposure can cause significant symptoms.  Dale explains that after sitting near a coworker who ate shellfish at her desk, her throat became itchy, her eye began to twitch, and she noticed "welts" on her arms.  (ECF No. 16-4, PageID.496–97).  By the time Dale left the area, her "breathing was horrible" and she had to use her "inhaler." (*Id.* at PageID.497).  Dale also claims to have vomited on her way to the main campus.  (*Id.*)  On another

occasion, Dale's eyes began to swell and became itchy after a coworker microwaved shellfish in her presence.   (ECF No. 16-3, PageID.359–60; *see also id.* at PageID.320–21).  Compared to most people in the general population, Dale's ability to perform basic activities such as breathing, eating, speaking, working, and concentrating are substantially limited when her condition is active.

True, over three decades at the VA, Dale's shellfish allergy had little impact on her ability to work.  But even before the ADAAA, an employee's ability to "work" was just one of several major life activities, and an impairment need not have had any impact on an individual's ability to work to qualify as a disability.  *Toyota Motor*, 534 U.S. at 201; *see Sutton*, 527 U.S. at 497–98 (Stevens, J., dissenting).  And more to the point, only Dale's symptoms when her condition is active are relevant.  Because Dale's shellfish allergy substantially limits several major life activities when active, she can genuinely dispute whether her shellfish allergy is a disability for purposes of the Rehabilitation Act.

Dale cannot, however, genuinely dispute whether she is disabled by her formaldehyde allergy.  In her formal accommodation request, Dale asked to be relocated to a facility where she would not be exposed to shellfish.  (*See* ECF No. 20-7, PageID.770).  When the VA offered to relocate her to a trailer on the main campus, Dale declined the accommodation, explaining that she believed that all trailers emitted formaldehyde, to which she was allergic.  (*See* ECF Nos. 16-15, 16-

22, 16-24).   In essence, Dale argues that the VA offered to accommodate one disability by neglecting another.

But Dale presents no evidence from which a reasonable factfinder could infer that she has a formaldehyde allergy, let alone an allergy severe enough to substantially limit any major life activity.   Although her brief claims that formaldehyde exposure can cause a burning sensation in her eyes, chest tightness, "wheezing, fatigue[,] and headaches," she cites no evidence to substantiate any of these assertions.  (ECF No. 20, PageID.696).  Although the Court need not rummage through Dale's exhibits to find support for her arguments, Fed. R. Civ. P. 56(c)(3), it appears that Dale relies on two materials to establish her allergy.  First is a note from her doctor stating Dale has "allergic rection[s]" to formaldehyde causing shortness of breath.  (ECF No. 16-18, PageID.664–66).  But "'[a] medical diagnosis alone is not enough to demonstrate a disability under the ADA.'"  *Kelly v. First Data Corp.*, No. 1:19-cv-372, 2021 WL 3722760, at *5 (S.D. Ohio Aug. 23, 2021) (quoting *McNeil v. Wayne Cty.*, 300 F. App'x 358, 361 (6th Cir. 2008)).  Sure, formaldehyde exposure may affect Dale's breathing, but broadly claiming that she experiences shortness of breath does not allow a factfinder to compare the impact of formaldehyde exposure on Dale's major life activities to the impact of formaldehyde exposure on the major life activities of an average person.  Dale needs to establish the degree of her allergy, not just its existence.  *See McNeil*, 300 F. App'x at 361.

23

Second, Dale testified at her deposition that she became "sick" on several occasions where she believed that she had been exposed to formaldehyde. (ECF No. 16-3, PageID.472, 489).   But again, merely stating that she gets "sick" from formaldehyde does not elucidate the degree of her allergy enough for a factfinder to assess its impact on her major life activities.

Thus, I suggest that Dale cannot genuinely dispute whether her formaldehyde allergy is a disability under the Rehabilitation Act.  Of course, that is not to say that the presence of any hazards in Building 38, including formaldehyde, are irrelevant in assessing the reasonableness of the VA's proposed accommodation.  Rather, the VA's failure to accommodate Dale's formaldehyde allergy cannot independently violate the Rehabilitation Act.

### b.    Dale Declined a Reasonable Accommodation

Assuming that Dale required accommodations for her shellfish allergy—a point the VA disputes—she cannot establish a prima facie case because the VA offered reasonable accommodations.  Under the Rehabilitation Act, the onus is on the disabled employee to request a reasonable accommodation. *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 202–03 (6th Cir. 2010).   After receiving an accommodation request, the employer need not propose any "counter accommodations," but it must "engage in an interactive process" with the employee to identify "potential reasonable accommodations."  *Fisher*, 951 F.3d at 421.  Both

24

parties must work together in a good faith effort to "identify the precise limitations resulting from the disability and potential" solution to overcome them. *Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 605–06 (6th Cir. 2018). When one party obstructs this process, courts must "isolate the cause of the breakdown and then assign responsibility." *Fisher*, 951 F.3d at 421 (internal quotation marks omitted) (quoting *Kleiber*, 485 F.3d at 871).

If this interactive process uncovers multiple potential accommodations, the employer has "discretion to choose between effective accommodations . . . ." *Hankins v. The Gap, Inc.*, 84 F.3d 797, 800–01 (6th Cir. 1996) (internal quotation marks omitted). If the offered accommodation is reasonable and would be effective, the employee cannot force his or her employer to "provide a specific accommodation . . . ." *Id.* And if the employee rejects a reasonable accommodation, then he or she "will not be considered a qualified individual with a disability." 29 C.F.R. § 1630.9(d); *see also Keever v. City of Middletown*, 145 F.3d 809, 812 (6th Cir. 1998).

Far from stonewalling Dale throughout this process, the VA took proactive measures to address Dale's allergy even before she filed her formal accommodation request. Before 2018, Dale worked at the VA for twenty-six years without incident by informing her colleagues of her allergy and avoiding contact with shellfish. (*See* ECF No. 16-3, PageID.297, 300, 321–23, 360, 366, 368; ECF No. 16-4, PageID.496; ECF No. 20, PageID.696). And following the April 2018 incident, the Department

25

posted a sign in Dale's workspace warning her coworkers that she had an "extreme sensitivity" to shellfish.  (ECF No. 16-8).  Around this time, White and Biggins emailed Dale's department, instructing employees to only consume shellfish in the breakroom, rather than at their desks where Dale could be exposed.  (ECF No. 16-11, PageID.611).  Since this email, Dale has generally been able to avoid exposure to shellfish.  (ECF No. 16-3, PageID.359–63).  Indeed, Dale admits that she has had only one other allergic reaction at work between 2018 and 2022.  (*Id.*)

When Dale formally requested a reasonable accommodation, the VA continued to cooperate with her to mitigate her shellfish exposure.  In October 2018, about five months after her reaction, Dale first asked the VA to accommodate her allergy.[3]  (ECF No. 16-17, PageID.662).  In her accommodations request form, she asked for a "relocation" of her "office/workstation" other than "telework."  (*Id.*)[4]

---

[3] Dale's brief asserts that she filed an earlier accommodation request before October 29, 2018.  (ECF No. 20, PageID.699–700).  But the record contains no evidence of this request, and the email chain Dale relies on to prove that this request exists only discusses her October 29 request.  (ECF No. 20-6).

[4] At her deposition, Dale implied that she did not just seek to be "cloistered" from employees who had exposed her to shellfish, but that she desired to avoid shellfish exposure by working in her own office rather than a shared workspace.  (*Compare* ECF No. 16, PageID.137, *with* ECF No. 379–80, 409).  Yet her accommodation request form—which VA officials encouraged her to review and fill out with as much "specifici[ty] as possible"—only asked to be relocated on site.  (ECF No. 16-16; ECF No. 16-17, PageID.662).  And when the VA offered to relocate her to a cubicle in Building 38, she rejected the accommodation exclusively on the grounds that Building 38 contained formaldehyde.  (ECF No. 16-15, PageID.658; ECF No. 16-23, PageID.673; ECF No. 16-24, PageID.674; *see also* ECF No. 16-3, PageID.395–96).  She did not object to the accommodation because she might share an open workspace with others.  Nor did she ask whether she would share the trailer with other employees.  In fact, Dale told an EEO

26

The VA agreed that Dale was entitled to an accommodation, and offered to relocate her to Building 38, a manufactured trailer on the main campus.  (ECF No. 16-3, PageID.351–52; ECF No. 16-19; ECF No. 16-21; ECF No. 16-24, PageID.674).

Yet Dale rejected their offer.  She feared that because Building 38 was a "manufactured" trailer, it would emit formaldehyde fumes. (*See* ECF No. 16-3, PageID.350; ECF No. 16-24, PageID.674).[5]  Beyond second-hand statements from a manufactured homes salesperson, and a FEMA "pamphlet" she did not attach to her motion, Dale does not provide any evidence suggesting that "manufactured" buildings emit more formaldehyde than other types of structures.  (ECF No. 16-3, PageID.353, 401, 472, 488–89).  Nor does she clarify how much formaldehyde she can be exposed to before having an allergic reaction.  (ECF No. 20).

Still, the VA took Dale's concerns seriously and ordered that a formaldehyde test be conducted as soon as possible.  (ECF No. 16-11, PageID.672).  Although the test results showed negligible concentrations of formaldehyde, far below acceptable standards, Dale still refused to relocate herself to Building Thirty-Eight.  (ECF No. 16-23, PageID.673; ECF No. 16-24, PageID.674–75, ECF No. 16-25, PageID.676–

---

specialist, after declining to move into Building 38, that she would be willing to move into a cubicle in other locations.  (ECF No. 16-25, PageID.676).  Dale can identify no evidence showing that she requested to be relocated to an individual office before the VA closed her accommodation request and moved her back to the main building.

[5] Again, Dale claims to have rejected a similar offer to relocate her into Building 30 which is also a manufactured trailer.  (ECF No. 16-3, PageID.315–16, 396).

77).  Why?  Because she believed that formaldehyde levels could fluctuate based on temperature, and the VA tested for formaldehyde during the winter.  (ECF No. 16-3, PageID.488–89; *see* ECF No. 16-25, PageID.676).  But once again, Dale provides no evidence to substantiate her opinion.

Only after Dale refused to accept the test results did the VA dismiss her dubious concerns over formaldehyde exposure and end the interactive process.  Yet even after it ended the interactive process, the VA followed through on its promise to supply Dale with an air purifier—which Dale eventually stopped using because it was "too loud."  (ECF No. 16-3, PageID.310, 312; ECF No. 16-25, PageID.677).  And in October 2019, Dale's immediate supervisor offered to allow her to telework, but Dale declined this offer.  (ECF No. 20-6, PageID.767).  Although VA staff encouraged Dale to reopen her accommodation request after moving Dale's department to a manufactured trailer, Dale refused to do so because she felt that she should not have to "start a totally new process."  (*Id.* at PageID.765–66; *see also* ECF No. 16-3, PageID.316, 405).

At bottom, the VA cooperated with Dale in good faith throughout the interactive process, taking several measures to mitigate her exposure to shellfish and formaldehyde.  By offering Dale a private workspace and testing that workspace for formaldehyde, the Department offered an accommodation far beyond what was necessary to control Dale's shellfish allergy.  Although transferring Dale to a new

worksite may have been unreasonable if it would expose her to hazardous working conditions, Dale does not present enough evidence for a reasonable factfinder to conclude that Building Thirty-Eight contained dangerous levels of formaldehyde. And while Dale claims that she cannot perform her job by teleworking, her own supervisor allowed her to do so.  (ECF No. 16-3, PageID.316, 405).  Accordingly, Dale cannot raise a genuine dispute as to whether the VA failed to offer a reasonable accommodation and she therefore cannot establish a prima facie case of discrimination.  For that reason, I suggest that the Court enter summary judgment in favor of the VA on Dale's reasonable accommodation claim.

### 2.    Retaliation

The Rehabilitation Act prohibits employers from retaliating against employees for enforcing their rights under the Act.  29 C.F.R. § 33.13; *see* 29 U.S.C. § 794(a).  Whether a plaintiff relies on direct or indirect evidence of retaliation, a retaliation claim fundamentally consists of three elements: (1) the plaintiff engaged in a protected activity under Section 504 of the Rehabilitation Act, (2) the employer took an "adverse action" against the employee, and (3) "there was a causal connection between the protected activity and the adverse action." *See A.C. ex rel. J.C. v. Shelby Cty. Bd. of Educ.*, 711 F.3d 687, 696–97 (6th Cir. 2013).

Although Dale could establish causation with direct evidence of retaliation, cases where an employer admits to a retaliatory or discriminatory motive are rare.

*Tate v. Hamilton Cty. Election Comm'n*, No. 1:19-CV-00127, 2022 WL 1091537, at *3 (E.D. Tenn. Mar. 30, 2022).  And this is not one of those rare cases.   So to prove causation, Dale must follow the familiar *McDonnell Douglas* framework to present circumstantial evidence of retaliation that would allow the factfinder to infer that the employer took an adverse action for a retaliatory purpose.  *A.C.*, 711 F.3d at 696–97.  Under *McDonnell Douglas*, the employee has the initial burden to "establish a prima facie case of . . . discrimination."  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  If the employee successfully puts forth a prima facie case of discrimination, the burden then shifts to the employer to provide a "legitimate, nondiscriminatory reason" for the adverse employment action.  *Id.*  The burden then shifts back to the employee to provide evidence that the employer's justification is pretextual, and that the employer's adverse employment action was actually motivated by the employee's disability.  *Id*. at 804.

To establish a prima facie case of retaliation under *McDonnell Douglas*, the employee must still establish that he or she engaged in a protected activity and suffered an adverse action.  *Kirilenko-Ison*, 974 F.3d at 661.  But to establish causation, the employee must (1) show that "the defendant knew of the protected activity" and (2) present some other circumstantial evidence of a "causal connection" between the protected activity and the adverse action.  *Id.*  Because the *McDonnell Douglas* framework is itself designed to assess causation, an employee

30

need not prove pretext at the prima facie stage of the analysis.  *A.C.*, 711 F.3d at

698–99.  Indeed, the Plaintiff's initial burden of establishing causation at the prima

facie stage "is not onerous"; the plaintiff need only "put forth some evidence to

deduce a causal connection."  *Id.* at 697, 699 (internal quotation marks omitted).

Evidence such as a close temporal proximity between the protected activity and the

adverse action, for example, may be relevant at this stage.  *Id.*; *see also Kirilenko-*

*Ison*, 974 F.3d at 664–65.

 Although Dale alleges eight distinct adverse actions in her complaint, she

provides evidence of just two in response to the VA's motion.[6]  (*Compare* ECF No.

1, PageID.19, ¶ 59, *with* ECF No. 20, PageID.706–08).  First, Dale alleges that White

tanked her performance reviews by checking a box stating that Dale's performance

was only "fully successful" even though she had rated Dale as "excellent" for two

years prior to the accommodation request.  (ECF No. 1, PageID.19, ¶ 59d; *see also*

ECF No. 20-8; ECF No. 20-9).  And second, Dale alleges that White refused to

---

[6] The VA's motion for summary judgment asserts that there is "no record evidence to support any of the" remaining six allegations.  (ECF No. 16, PageID.143).  Although the Defendants do not cite any exhibits in support of this assertion, they "need not prove a negative . . . on an issue that" Dale carries the burden of proof.  *Parker v. Sony Pictures Entm't, Inc.*, 260 F.3d 100, 111 (2d Cir. 2001).  Rather, the VA "need only point to an absence of proof on [Dale's] part," and in response, Dale must cite "specific facts" supporting her allegations.  *Id.*  Because Dale does not identify any "specific facts" in response to the VA's assertions, she fails to raise a genuine dispute on these six adverse actions.  *Id.*

"submit the necessary paperwork" to promote Dale to a position for which she was eligible.  (ECF No. 1, PageID.19, ¶ 59g; *see also* ECF No. 21-3; ECF No. 21-4).

Dale's lowered performance reviews, even if motivated by her accommodation request, are not sufficiently adverse to violate the Rehabilitation Act.  An adverse action is one that would "dissuade a reasonable person from engaging in the protected activity . . . ."  *A.C.*, 711 F.3d at 698.  A subpar performance evaluation is not adverse enough to dissuade a reasonable person from enforcing his or her rights unless it "has an adverse impact on an employee's wages or salary."  *Tuttle v. Metropolitan Gov't of Nashville*, 474 F.3d 307, 322 (6th Cir.2007); *see also White v. Baxter Healthcare Corp.*, 533 F.3d 381, 402 (6th Cir. 2008).  The only consequence of her lowered performance reviews, according to Dale, is that she missed out on "performance bonuses."  (ECF No. 20, PageID.706–07).  But Dale cites no evidence in support of this assertion, and her attorney's statements in a brief are not evidence.  (*Id.*); *see Mack v. Bessner*, 512 F. Supp. 3d 784, 799 (E.D. Mich. 2021).  Because Dale presents nothing more than modestly lowered performance evaluations, she fails to demonstrate an adverse action.

As for Dale's claim that White refused to help her obtain a promotion, she fails to establish the causation element of her prima facie case.  She presents no evidence that White had any control over the decision to promote her. (ECF No. 20, PageID.707–08).  Dale does not explain what "paperwork" White should have filed,

nor does she explain, generally, what she believes White's role in the process to have been.  (*Id.*)  In fact, all evidence suggests that White had no influence over the decision to promote Dalle, as that choice fell entirely on the "facility" rather than Dale's immediate supervisor.  (ECF No. 21-3, PageID.900).

Even if White could influence the decision to promote Dale, the decision not to promote Dale predates her allergic reaction by about two years.  Indeed, Dale first became eligible for, and sought, the promotion in 2016.   (ECF No. 21-4, PageID.905–07).  Yet Dale cites no changes in the intervening two years that would have led White to help Dale secure the promotion but for the reasonable accommodation request.  The temporal relationship between Dale's eligibility and her accommodation request suggests that the responsible officials declined to promote Dale for other reasons.

Accordingly, I suggest that Dale fails to raise a genuine dispute of material fact on her retaliation claim.

### 3.   Hostile Work Environment

Last, the VA moves for summary judgment on Dale's Hostile Work Environment claim.  To prevail on a hostile work environment claim, Dale must prove that: "(1) she was disabled; (2) she was subject to unwelcome harassment; (3) the harassment was based on her disability; (4) the harassment unreasonably interfered with her work performance; and (5) the defendant either knew or should

have known about the harassment and failed to take corrective measures." *Trepka v. Bd. of Educ.*, 28 F. App'x 455, 461 (6th Cir. 2002) (first citing *Blankenship v. Parke Care Ctrs., Inc.*, 123 F.3d 868, 872 (6th Cir.1997); and then citing *Crawford v. Medina Gen. Hosp.*, 96 F.3d 830, 834 (6th Cir.1996)).  The alleged harassment must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and [to] create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  The Rehabilitation Act is not a civility code, and conduct that is "merely offensive" falls short of harassment.  *Id.*; *see also Stevens v. Adler*, No. 3:09CV-593-S, 2010 WL 1929906, at *4 (W.D. Ky. May 12, 2010).

Dale alleges that the VA "created [or] condoned" a hostile work environment in six ways.  She alleges that: (1) her "job performance was "hyper scrutinize[ed]"; (2) she was "discipline[ed] based on the hyper [scrutiny]" of her performance"; (3) she was required "to take on job responsibilities assigned to another employee"; (4) while cutting an apple, White "pointed a knife [at Dale]," stated that Dale liked "throwing [her] under the bus" and stated that Dale "wouldn't go back to EEO or the union because they can't help her";[7] (5) she was threatened "with relocation to" facilities with "trace[]" amounts of formaldehyde; and (6) the VA "condon[ed]

---

[7] Dale took these statements as a "direct threat to do physical violence if" she "continued to complain about reasonable accommodations."  (ECF No. 1, PageID.17, ¶ 51d).  Dale does not allege that this incident constituted unlawful retaliation, but even if she did, her claim would fail because no reasonable person could construe White's statements as a threat to physically harm Dale.  *See A.C.*, 711 F.3d at 698.

employees . . . to smoke and eat or warm-up shellfish at her worksite . . . ." (ECF No. 1, PageID.17–18, ¶ 51).[8]

Dale does address this claim in her response to the VA's motion for summary judgment. She neither elaborates on the specific conduct with which she takes issue, nor does she cite any portion of the record supporting her allegations. (ECF No. 20); *see* Fed. R. Civ. P. 56(c)(3). Based on the Undersigned's review of the record and the VA's briefing, I find the alleged instances of harassment are either too obscure to understand, lacking in any evidentiary support, or descriptive of merely "offensive" behavior. Accordingly, I recommend that the Court grant summary judgment in favor of the VA on Dale's hostile work environment claim.

### D. Conclusion

For these reasons, **I RECOMMEND** that the Court **GRANT** Defendant's Motion for Summary Judgment (ECF No. 16).

## III. <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days

---

[8] Dale's complaint does not mention the incidents between January and March of 2018 where White and other employees knowingly caused Dale to experience allergic reactions and mocked her symptoms.

after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this R&R. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this R&R to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  February 28, 2024                    s/ PATRICIA T. MORRIS
                                            Patricia T. Morris
                                            United States Magistrate Judge